

IN THE

# Court of Appeals of Indiana

Tina Marie Campbell,

*Appellant-Petitioner/Mother*

v.

Jeffrey Allen Campbell,

*Appellee-Respondent/Father*



FILED

Dec 30 2024, 10:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

December 30, 2024

Court of Appeals Case No.
24A-DC-1004

Appeal from the Lake Superior Court

The Honorable Calvin D. Hawkins, Special Judge

Trial Court Cause No.
45D02-2110-DC-670

---

**Opinion by Judge Pyle**
Judges Weissmann and Felix concur.

**Pyle, Judge.**

## Statement of the Case

[1] Tina Campbell ("Mother") appeals the trial court's order dissolving her marriage to Jeffrey Campbell ("Father") (collectively "Parents"). Mother argues that: (1) the trial court abused its discretion when it awarded Parents joint physical custody of their two children ("the children"); (2) the trial court failed to rule on one issue and abused its discretion when it ruled on another issue that Parents had stipulated would be deferred to the final hearing; (3) the trial court abused its discretion when it divided the marital property; and (4) the non-disparagement clause in the dissolution decree amounts to an unconstitutional prior restraint on speech.

[2] We conclude that the trial court did not abuse its discretion when it awarded Parents joint physical custody of the children and affirm that portion of the trial court's order. However, we further conclude that: (1) the trial court failed to rule on one issue and abused its discretion when it ruled on another issue that Parents had stipulated would be deferred to the final hearing; (2) the trial court abused its discretion when it divided the marital property; and (3) the non-disparagement clause in the dissolution decree amounts to an unconstitutional prior restraint on speech. Accordingly, we reverse those portions of the trial court's order and remand with instructions for the trial court to: (1) rule on the two issues that Parents' stipulations in the May 2022 provisional order deferred

to the final hearing; (2) re-divide the marital property; and (3) strike the non-disparagement clause from the dissolution decree.

We affirm in part, reverse in part, and remand with instructions.

## Issues

1.  Whether the trial court abused its discretion when it awarded Parents joint physical custody of the children.

2.  Whether the trial court failed to rule on one issue and abused its discretion when it ruled on another issue that Parents had stipulated would be deferred to the final hearing.

3.  Whether the trial court abused its discretion when it divided the marital property.

4.  Whether the non-disparagement clause in the dissolution decree is a prior restraint on speech.

## Facts

[3] Parents were married in September 2010. Their son, C. ("C."), was born in January 2012, and their daughter, Ca. ("Ca."), was born in July 2013. In October 2021, Mother filed a dissolution petition.

[4] In May 2022, the trial court issued a provisional order ("the May 2022 provisional order"), which provided that Parents had stipulated to the following:

D. Each party shall have temporary use and possession of the vehicle in his or her possession and shall be responsible for any and all obligations due and owing thereon, including automobile insurance. Parties defer the issue of who is responsible for Mother's car payment provisionally until final hearing.

*      *      *      *      *

G. Any arrearages in child support or extracurricular activities shall be deferred and/or any credits given for the same shall be deferred until the final hearing.

(App. Vol. 2 at 29).

[5] Parents also stipulated in the May 2022 provisional order that Mother would have temporary physical custody of the children. In addition, the trial court awarded Mother parenting time that included four overnight visits with the children each week. The trial court further awarded Father parenting time that included three overnight visits with the children each week.

[6] The day before the two-day February 2024 dissolution hearing, Mother filed a written request for findings of fact and conclusions thereon pursuant to Trial Rule 52(A). At the hearing, Mother testified that she and the children were very close. Mother further testified that the "structure, stability, [and] the family life that [she was] providing currently [was] truly what [was] best for them." (Tr. Vol. 1 at 64). In addition, the trial court admitted into evidence Mother's Exhibit 1, which included several photographs of Mother and the children "making memories." (Tr. Vol. 1 at 11). Mother, who also testified

that the children were doing well in school, asked the trial court to award her sole physical custody of the children.

[7] Mother also testified that the loan for the Toyota Highlander that she drove was in both her and Father's names. She further testified that Father had paid her monthly car payment during the course of the marriage. After the trial court had issued the provisional order, Mother had begun making the payments. Mother asked the trial court to order Father to reimburse her for the $254 monthly car payments that she had made following the issuance of the provisional order until the time of the final hearing. Mother agreed to pay off the remainder of the loan from her share of the net proceeds of the sale of the marital residence. Mother further testified that Father had accrued a child support arrearage of $8,052 from the date that she had filed the dissolution petition until the issuance of the provisional order. She asked the trial court to order Father to pay her that arrearage.

[8] In addition, during Mother's testimony, the trial court admitted into evidence Mother's Exhibit 20, which was Mother's list of Parents' assets, including her request for a distribution of those assets. Mother's list included: (1) a horse trailer valued at $5,000; (2) Father's Lincoln FD Retirement Account valued at $181,462.99; (3) Father's Lincoln Retirement Account valued at $66,361.41; (4) Mother's Lincoln Retirement Account valued at $17,802.17; (5) Mother's Lincoln Retirement Account valued at $43,147.63; (6) a Jet Bandsaw valued at $800; (7) a Grizzly Planer valued at $2,000; and (8) the marital residence valued at $258,000.

[9]     Mother also included her Toyota Highlander on her list, but she listed the value as zero. Mother's list also included a Bobcat Skidder ("the Bobcat") valued at $28,000. Mother included in the liabilities section of her list Father's $23,432.67 credit card debt on the Bobcat. Mother further testified that she had not included the value of her horse on her list because the horse was a pet. Mother asked the trial court to award her 60% of the marital assets and to award Father 40% of the marital assets. In addition, Mother asked the trial court to order any equalization payment payable to her from Father to come from Father's proceeds from the sale of the marital residence.

[10]    Father testified that he has always been active in the children's lives. For example, Father has participated in the children's school events and has taken the children to medical appointments. Father also helps the children with their homework and specifically testified as follows:

> We do math homework. We do spelling tests using the presidents so they can do a two for one, learn the presidents and learn how to spell. We play the capitals game whenever we're driving in the car instead of listening to the radio or getting on devices where I'll name a state and they have to name the capital or I name the capital, they have to name the state. I speak Spanish with the children often, try to get them to learn another language. I have [C.] come out in the garage and measure things with me, so he can put the math to real life experience, understand how that works. It also helps better with fractions when you are using a tape measure.

(Tr. Vol. 2 at 52). Father also took the children on vacation to Florida and would like to take them on international trips. However, according to Father,

Mother refuses to allow the children to apply for passports. In addition, Father takes the children to the YMCA so that they stay active. Further, Father, who had been living in the marital residence, testified that following the sale of the marital residence, he planned to live as close as possible to the children. Father further testified that he had accrued a child support arrearage of $3,856 from the date that Mother had filed the dissolution petition until the issuance of the provisional order.

[11] In addition, during Father's testimony, the trial court admitted into evidence Father's Exhibit G, which was Father's list of Parents' assets, including his request for a distribution of those assets. Father's list included: (1) the marital residence valued at $258,000; (2) Father's Lincoln FG Retirement Account valued at $181,462.99; (3) Father's Lincoln Retirement Account valued at $66,361.41; (4) Mother's Lincoln Financial Group Retirement Account valued at $43,147.63; and (5) Mother's Lincoln Financial Group 403B Plan Retirement Account valued at $17,802.17.

[12] Father's list also included Mother's Toyota Highlander, which he valued at $12,162.47. He included a notation that the Kelley Blue Book value of the vehicle was $30,000 and that Mother still owed $17,838.53 on the vehicle's loan. In addition, Father's list included the Bobcat, which he valued at $4,567.63. He included a notation that Parents had agreed that the value of the Bobcat was $28,000 but that he still owed a $23,432.87 credit card debt for the Bobcat.

[13] Father further testified that he had begun contributing to the $181,462.99 retirement account eighteen years before the marriage. He did not know how much he had contributed to that account during those eighteen years, but he testified that it was "a significant amount[.]" (Tr. Vol. 2 at 114). Father asked the trial court to award him that portion of the account that had accrued prior to the marriage. Father further testified that Mother had begun paying into one of her retirement accounts two to five years before the marriage and that she could also "have credit for how many years she had her pension before [they] had] got[ten] married." (Tr. Vol. 2 at 161).

[14] In addition, Father testified that the Jet Bandsaw and the Grizzly Planer that Mother had included on her marital assets list did not exist. According to Father, Mother had simply been confused about his tools and he had never owned those items. Father further testified that he owned a Grizzly Bandsaw, which was extremely old and had no value. He offered to give that item to Mother. Father also testified that he owned a twenty-year-old planer that a co-worker had given to him and that he would be surprised if he could sell it for $40.

[15] The only other witness who testified at the hearing was Guardian Ad Litem Jennifer Irons Jostes ("GAL Irons Jostes"). According to GAL Irons Jostes, who had met with the children several times, the children have good relationships with and love both parents. When asked if she believed that the children loved Father at the same level that they loved Mother, GAL Irons Jostes responded, "Absolutely." (Tr. Vol. 1 at 122). GAL Irons Jostes further

testified that the children rely on Father for help with their homework. Specifically, she testified as follows:

> They will tell you that mother also helps with their homework. But, according to the kids, mom's really good at art, and she can help them but she's not the best teacher. They will gush about their father and his ability to help them with their homework and to really explain things so that they can understand, and that is who they turn to to help them when they're struggling. And they both have actually had some problems with math over this last semester, and they were very quick to tell me that dad's been really helping them get through that.

(Tr. Vol. 1 at 122).

[16] GAL Irons Jostes also testified that Mother is hypercritical of everything that happens when the children are at Father's house. GAL Irons Jostes was not sure if Mother did not trust Father or just needed to control everything that concerned the children. GAL Irons Jostes further testified that Father is not critical of Mother and wants the children to have a positive relationship with her.

[17] GAL Irons Jostes recommended that Parents share physical custody of the children. She also testified that the children did not like the current schedule of going back and forth between Mother and Father during the week. According to GAL Irons Jostes, the children would like to spend a week at a time with each parent.

[18]     In April 2024, the trial court issued a dissolution order with findings of fact and conclusions thereon.[1] The trial court's order provides, in relevant part, as follows:

### STIPULATIONS

f. The Father is awarded the Toyota Tundra vehicle which he drives and which has no loan associated with it. The Mother is awarded the Toyota Highlander vehicle which she drives. There is a loan in both parties' names associated with the Mother's vehicle. The Mother shall pay off the remainder of the vehicle loan in full from her share of the net proceeds from the sale of the marital residence.

### FINDINGS OF FACT

1. The Court finds that the Guardian Ad Litem's testimony is credible and her investigation is based on substantial meetings with the children and the parties and review of all of the relevant documents. . . .

2. The GAL met with the children on more than one occasion and the children were consistent in their wishes to have an equal amount of time with both Mother and Father.

---

[1] Mother asserts that the trial court "essentially adopt[ed] *verbatim* most of [Father's] proposed order[.]" (Mother's Br. 9). We have reviewed Mother's proposed thirty-seven-page order, Father's proposed twenty-three-page order, and the trial court's nine-page order. Our review reveals that the trial court adopted some, but not all, of Father's proposed findings. Trial Rule 52(C) encourages trial courts to request that the parties submit proposed findings of fact and conclusions thereon, and it is not uncommon or per se improper for trial courts to enter findings that are verbatim reproductions of these submissions. *In re Marriage of Nickels*, 834 N.E.2d 1091, 1095 (Ind. Ct. App. 2005). We have explained that trial courts are faced with an enormous volume of cases, and "[t]he need to keep the docket moving is properly a high priority for our trial bench." *Id.* (cleaned up). "For this reason, the practice of adopting a party's proposed findings is not prohibited." *Id.* (cleaned up). When a trial court adopts a party's findings of fact and conclusions thereon as its own, the trial court is ultimately responsible for their correctness. *Pilkington v. Pilkington*, 227 N.E.3d 885, 891 n.3 (Ind. Ct. App. 2024).

3. The children reported to the GAL on more than one occasion that they did not want to have parenting time where they were pivoting back and forth within the same week between the households and wished that they had more consistent time with each parent.

4. The GAL recommended that the children spend two weeks on and two weeks off at each home.

5. The Court finds that from Mother's testimony, Father's testimony, and GAL's testimony, the children are doing exceptionally well; they have adapted to living in separate households; there have been no school issues; and, the children earned good grades.

\*     \*     \*     \*     \*

16. The Court finds that Father substantially supported Mother and the children provisionally up through the date of the Provisional Court Order.

**CONCLUSIONS OF LAW & ORDER OF THE COURT**

\*     \*     \*     \*     \*

8. The Court adopts the Guardian Ad Litem's recommendations and finds that the parties shall now share physical custody of the parties' minor children.

\*     \*     \*     \*     \*

10. Neither parent will disparage the condition of the other parent[']s[] home or the parenting skills or the lack thereof to medical providers, school personnel, coaches, etc., without a good faith basis that it is having an impact on either child's health.

\*     \*     \*     \*     \*

16. As Mother and Father will now share physical custody of the parties' children, they will each be awarded one-week, alternating year-round. The parties will exchange their children on Friday after school. If there is not school on Friday, then the time shall be 4:00 P.M.

(App. Vol. 2 at 12-19).

[19] The trial court also completed a marital assets sheet to distribute Parents' property. The trial court listed the marital residence but did not assign it a value. Rather, the trial court simply noted that the house would be sold and that the parties were to divide the proceeds equally. Further, the trial court included in the marital pot $112,507.05 of Father's $181,462.99 Lincoln Retirement Account, which the trial court identified as a Lincoln Financial Group account. However, the trial court excluded $68,955.54, which it calculated was 38% of the account, from the marital pot because the "account [was] premarital[.]" (App. Vol. 2 at 23). The trial court also included in the marital pot $23,731 of Mother's $66,361.41 Lincoln Financial Group Retirement Account. The trial court excluded $43,147.63, which it calculated was 45% of the account, from the marital pot because the "account [was] premarital[.]" (App. Vol. 2 at 23).

[20] In addition, the trial court included the Bobcat in the marital pot with a value of $4,567.63. The entry included a note that Father owed a $23,432.67 credit card debt for the Bobcat. In addition, the trial court included in the marital pot one horse trailer valued at $1,000 and another horse trailer valued at $5,000. Further, the trial court's marital assets sheet stated that the Grizzly Planer and

the Jet Bandsaw did not exist. The trial court also ordered Father to pay Mother a $42,545.01 equalization payment from his "Lincoln LG Retirement" Account. (App. Vol. 2 at 23).

[21] The trial court's order also included the following two findings:

> 29. The Court finds that there is a basis to deviate from this presumption of a 50/50 division of the marital estate and awards each party their premarital portions of their retirement accounts.
>
> 30. The Court denies Mother's request to award her more than 50% of the marital estate as she has not met her burden as the parties' incomes are relatively similar, Mother is working full time and this was not a long-term marriage.

(App. Vol. 2 at 25).

[22] Mother now appeals.

## Decision

[23] At the outset, we note that there is a well-established preference in Indiana for granting latitude and deference to the trial court in family law matters. *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Id.* (cleaned up). "Appellate deference to the determinations of our trial court judges, especially in domestic relations

matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time." *Hahn-Weisz v. Johnson*, 189 N.E.3d 1136, 1141 (Ind. Ct. App. 2022). "Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children." *Id.*

[24] "On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Steele-Giri*, 51 N.E.3d at 124 (cleaned up). "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Id.* (cleaned up).

[25] We further note that Mother requested specific findings and conclusions pursuant to Indiana Trial Rule 52. The purpose of Trial Rule 52(A) is to provide the parties and the reviewing court with the theory upon which the trial court decided the case in order that the right of review for error may be effectively preserved. *In re Paternity of S.A.M.*, 85 N.E.3d 879, 885 (Ind. Ct. App. 2017). When a trial court enters findings of fact and conclusions of law pursuant to Trial Rule 52, we apply the following two-tiered standard of review: (1) whether the evidence supports the findings; and (2) whether the findings support the judgment. *Hazelett v. Hazelett*, 119 N.E.3d 153, 157 (Ind. Ct. App.

2019). The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting the judgment. *Id*. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id*. We neither reweigh the evidence nor assess the credibility of the witnesses but consider only the evidence most favorable to the judgment. *Id*.

[26] Lastly, we note that Father did not file an appellee's brief. When an appellee does not submit a brief, we do not undertake the burden of developing arguments for that party. *Easterday v. Everhart*, 201 N.E.3d 264, 268 (Ind. Ct. App. 2023). Instead, we apply a less strict standard of review and may reverse if the appellant establishes prima facie error. *Id*. Prima facie error is "error at first sight, on first appearance, or on the face of it." *Id*. (cleaned up). "Still, we are obligated to correctly apply the law to the facts in the record in order to determine whether reversal is required." *Jenkins v. Jenkins*, 17 N.E.3d 350, 352 (Ind. Ct. App. 2014). We now turn to the issues in this case.

[27] Mother argues that: (1) the trial court abused its discretion when it awarded Parents joint physical custody of their two children; (2) the trial court failed to rule on one issue and abused its discretion when it ruled on another issue that Parents had stipulated would be deferred to the final hearing; (3) the trial court abused its discretion when it divided the marital property; and (4) the non-disparagement clause in the dissolution decree amounts to an unconstitutional prior restraint on speech. We address each of her contentions in turn.

## 1. Child Custody

Mother argues that the trial court abused its discretion when it awarded Parents joint physical custody of the children. She specifically contends that the trial court should have awarded her sole physical custody of the children. We review child custody determinations for an abuse of discretion. *Rasheed v. Rasheed*, 142 N.E.3d 1017, 1021 (Ind. Ct. App. 2020), *trans. denied*.

In an initial custody determination, both parents are presumed equally entitled to custody, and the trial court shall "enter a custody order in accordance with the best interests of the child." I.C. § 31-17-2-8. In determining the best interests of the child, the court shall consider all relevant factors, including the following:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian . . . .

I.C. § 31-17-2-8.

[30]  Here, our review of the evidence reveals that, at the time of the dissolution hearing, Parents' son, C., was twelve years old, and their daughter, Ca., was ten years old. Mother wanted sole physical custody of the children, and Father wanted to share physical custody of the children with Mother. The children love both parents and want to spend equal time with each parent. Specifically, the children told GAL Irons Jostes that they would like to spend a week at a time with each parent.[2] In addition, the children are doing well in school and

---

[2] Mother points out that the trial court's order states that GAL Irons Jostes recommended that the children spend two weeks on and two weeks off at each parent's home and then ordered that the children spend alternating one-week periods at each parent's home. Mother specifically argues as follows:

> Thus, the Order on appeal contains two very different joint physical custody plans (a "*two weeks on and two weeks off*" plan and an arrangement wherein each parent is "*awarded one-week, alternating year round*"). These two very different parentings plans are incongruent and in direct conflict with each other. It is difficult to ascertain which joint physical custody arrangement the trial court actually ordered.

(Mother's Br. 38). We disagree and find no difficulty in ascertaining the joint physical custody arrangement that the trial court actually ordered. Our review of the evidence reveals that when GAL Irons Jostes testified,

primarily rely on Father for help with their homework. GAL Irons Jostes recommended that the trial court award Parents joint physical custody of the children. This evidence supports the trial court's findings and award to Parents of joint physical custody of the children. Mother's arguments regarding the statutory factors are simply invitations to reweigh the evidence, which we cannot do. *See Steele-Giri*, 51 N.E.3d at 124. The trial court did not abuse its discretion when it awarded Parents joint physical custody of the children.

## 2. Issues Deferred Until Final Hearing

[31]     Mother next argues that the trial court failed to rule on one issue and abused its discretion when it ruled on another issue that Parents had stipulated would be deferred to the final hearing. Specifically, she first argues that the trial court failed to rule on who was responsible for her car payments during the pendency of the May 2022 provisional order. Mother also specifically argues that the trial court abused its discretion when it concluded that Father had substantially supported Mother and the children provisionally up through the date of the

---

she recommended that the children spend alternating one-week periods at each parent's home. The trial court adopted GAL Irons Jostes' recommendation and ordered that the children spend alternating one-week periods at each parent's home. The trial court's separate finding that GAL Irons Jostes recommended that the children spend two weeks on and two weeks off at each parent's home is simply an immaterial misstatement that does not alter the parenting time schedule that GAL Irons Jostes recommended and that the trial court ordered. As recommended by GAL Irons Jostes and as set forth in the trial court's order, the children are to spend alternating one-week periods with each parent.

provisional order, failed to determine the amount of Father's child support arrearage, and failed to order Father to pay Mother that arrearage.

### A. Mother's Car Payment

[32] A stipulation is "a voluntary agreement between opposing parties concerning some relevant point." *Inland Steel Company v. Pavlinac*, 865 N.E.2d 690, 697 (Ind. Ct. App. 2007). Therefore, Parents' stipulations in the May 2022 provisional order are similar to a provisional agreement. We interpret settlement agreements under a de novo standard. *Scott v. Corcoran*, 135 N.E.3d 931, 939 (Ind. Ct. App. 2019). The rules governing contracts are applicable when we interpret the terms of the agreement. *Id.* If the terms are clear and unambiguous, the terms "are deemed conclusive." *Id.* (cleaned up).

[33] Regarding Mother's car payment, our review of the May 2022 provisional order reveals that Parents stipulated that they were "defer[ring] the issue of who is responsible for Mother's car payment provisionally until final hearing." (App. Vol. 2 at 29). These terms are clear and unambiguous.

[34] At the hearing, Mother testified that Father had paid her monthly car payment during the course of the marriage. After the trial court had issued the provisional order, Mother had begun making the payments. Mother asked the trial court to order Father to reimburse her for the $254 monthly car payments that she had made following the issuance of the provisional order until the time of the final hearing. However, the trial court failed to address this issue in its

order. Therefore, we remand this case to the trial court with instructions for the trial court to determine which parent is responsible for the cost of Mother's car payments from the time of the provisional order until the final hearing.

### B. Father's Child Support Arrearage

[35] The May 2022 provisional order also deferred the issue of Father's child support arrearage to the final hearing.[3] At the hearing, Mother testified that Father's child support arrearage from the time she filed the dissolution petition until the trial court's issuance of the May 2022 provisional order was $8,052. Father testified that his child support arrearage from that period of time was $3,856. The trial court determined that Father had "substantially supported Mother and the children provisionally up through the date of the Provisional Court Order." (App. Vol. 2 at 15). However, the trial court failed to determine the amount of Father's child support arrearage and failed to order Father to pay Mother that arrearage. In other words, the trial court essentially reduced Father's arrearage from the time Mother filed the dissolution petition to the issuance of the May 2022 provisional order to zero.

---

[3] The trial court determined that Father's child support arrearage from the time of the May 2022 provisional order until the date of the final hearing was $7,924. The trial court ordered that Father pay that amount to Mother at the rate of $100 per week until the arrearage was paid in full. Mother does not challenge the trial court's determination of that arrearage. She only challenges the trial court's failure to find and to order Father to pay her a child support arrearage that had accrued from the time that she filed the dissolution petition until the time of the May 2022 provisional order.

[36] Decisions regarding child support matters are within the sound discretion of the trial court. *Hicks v. Smith*, 919 N.E.2d 1169, 1171 (Ind. Ct. App. 2010), *trans. denied*. We reverse a child support decision only if there has been an abuse of discretion or the decision is contrary to law. *Id.* An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

[37] One of the purposes of child support is to provide children with regular and uninterrupted support. *Id.* It has long been held that the right to support lies exclusively with the children and that a custodial parent holds the child support payments in trust for the children's benefit. *Id.* As a constructive trustee, the custodial parent is the trustee of the non-custodial parent's obligation to pay and may not contract away the benefits of the constructive trust. *Id.* In addition, once the funds have accrued to the children's benefit, the trial court lacks the power to reduce, annul, or vacate the child support order retroactively. *Id.* at 1171-72. Thus, a party is generally required to make support payments in the manner specified in the child support order until the order is modified or set aside. *Id.* at 1172.

[38] Here, Mother testified that Father's child support arrearage from the time she filed the dissolution petition until the trial court's issuance of the May 2022 provisional order was $8,052. Father testified that his child support arrearage from that period of time was $3,856. Based on Parents' testimony of an outstanding child support arrearage, the trial court simply lacked the power to reduce the arrearage to zero. Accordingly, the trial court abused its discretion.

We, therefore, reverse the trial court's ruling on this issue and remand with instructions for the trial court to determine Father's child support arrearage from the time Mother filed the dissolution petition until the trial court's issuance of the May 2022 provisional order and to order Father to pay Mother that arrearage.

### 3. Division of the Marital Property

Mother also argues that the trial court abused its discretion when it divided Parents' property. She specifically contends that the trial court failed to include the value of all Parents' property in the marital pot for distribution and that the trial court improperly valued some of the marital assets.

### A. Marital Pot

The division of marital assets is within the trial court's discretion, and we will reverse a trial court's decision only for an abuse of that discretion. *Smith v. Smith*, 136 N.E.3d 275, 281 (Ind. Ct. App. 2019). On review, we will not reweigh the evidence or assess the credibility of witnesses. *Id*. Further, we will consider only the evidence most favorable to the trial court's disposition of the marital property. *Id*.

It is well-settled that in a dissolution action, all marital property goes into the marital pot for division, whether it was owned by either spouse before the marriage, acquired by either spouse in his or her own right, or acquired by their joint efforts. IND. CODE § 31-15-7-4(a); *Falatovics v. Falatovics*, 15 N.E.3d 108,

110 (Ind. Ct. App. 2014). For purposes of dissolution, property means "all the assets of either party or both parties." I.C. § 31-9-2-98(b). "The requirement that all marital assets be placed in the marital pot is meant to insure that the trial court first determines that value before endeavoring to divide property." *Montgomery v. Faust*, 910 N.E.2d 234, 238 (Ind. Ct. App. 2009). Indiana's "one-pot" theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award. *Falatovics*, 15 N.E.3d at 110. Although the trial court may decide to award a particular asset solely to one spouse as part of its just and reasonable property division, it must first include the asset in its consideration of the marital estate to be divided. *Id.* The systematic exclusion of any marital asset from the marital pot is erroneous. *Id.*

[42] In *Falatovics*, the trial court excluded the husband's interest in two parcels of real estate from the marital estate. On appeal, we concluded that the interest should have been included in the marital pot. *Id.* at 111. Further, we explained that although INDIANA CODE § 31-15-7-5 creates a rebuttable presumption that an equal division of the marital property between the parties is just and reasonable, an equal division may not be just and reasonable based on a proper consideration of all the factors set forth in the statute. *Id.* at 111-12. We therefore remanded the case with instructions for the trial court to include the husband's interest in the real estate parcels in the marital pot and to redistribute the marital assets as it deemed appropriate. *Id.* at 112.

[43] Here, Father had a $181,462.99 Lincoln Financial Group Retirement Account at the time of the dissolution hearing. Father had begun contributing to this retirement account eighteen years before Parents had married. The trial court included $112,463.99 of this retirement account in the marital pot, which was valued and distributed to the parties. However, the trial court excluded $68,955.54 from the marital pot because the account was premarital. Further, at the time of the dissolution hearing, Mother had a $66,361.41 Lincoln Financial Group Retirement Account. Mother had begun contributing to this account two to five years before the marriage. The trial court included $23,731 of this retirement plan in the marital pot. However, the trial court excluded $43,147.63 from the marital pot because the account was premarital. Similarly, the trial court failed to include the value of the residence in the marital pot. Thus, here, as in *Falatovics*, the trial court failed to include the total value of the parties' retirement accounts and the value of the marital residence in the marital pot for distribution.

[44] Accordingly, we conclude that the trial court abused its discretion when it failed to include all property in the marital pot. We therefore reverse that portion of the trial court's order dividing the marital estate and remand with instructions for the trial court to: (1) include the total value of Father's retirement account, Mother's retirement account, and the marital residence in the marital pot; (2) redistribute the assets and debts as deemed appropriate; and (3) enter findings that either an equal division of the parties' retirement accounts is just and reasonable under the circumstances or, alternatively, that the presumption of

equal division has been rebutted by evidence which could include that a portion of the parties' retirement accounts had accrued before Parents' marriage, and thus an equal division would not be just and reasonable. The trial court is instructed to recalculate the division of marital assets accordingly without the necessity of a hearing. *See Kendrick v. Kendrick*, 44 N.E.3d 721, 729 (Ind. Ct. App. 2015) (remanding the case to the trial court with instructions to include in the marital pot that portion of the husband's retirement account earned before the marriage without the necessity of a hearing), *trans. denied*.

### B. Valuation of the Marital Assets

[45] Mother also argues that the trial court abused its discretion in valuing some of the marital assets. We address those issues because they may arise on remand when the trial court redistributes the marital pot.

[46] The trial court has broad discretion in ascertaining the value of property in a dissolution action, and we will not disturb its valuation absent an abuse of that discretion. *Meyer v. East*, 205 N.E.3d 1066, 1072 (Ind. Ct. App. 2023). The trial court does not abuse its discretion if there is sufficient evidence and reasonable inferences therefrom to support the result. *Id.* In other words, we will not reverse the trial court unless the decision is clearly against the logic and effect of the facts and circumstances before it. *Id*. at 1072-73. We will not reweigh evidence, and we will consider the evidence in a light most favorable to the judgment. *Id*. at 1073.

[47] Mother first argues that the trial court erred when it valued the Bobcat at $4,567.63 when the parties had agreed that the value of the Bobcat was $28,000. Our review of the trial court's order reveals that the trial court made a separate notation on the marital assets list that Father owed a $23,432.67 credit card debt for the Bobcat. Technically, the trial court did not abuse its discretion in valuing the Bobcat. However, the better practice would have been for the trial court to value the Bobcat at $28,000 and to include Father's $23,432.67 debt in a separate liabilities section. *See id*. (explaining that the marital property includes both assets and liabilities).

[48] Mother further argues that the trial court abused its discretion when it included in the marital pot two horse trailers, one valued at $1,000 and another valued at $5,000. Mother contends that she testified that she has one horse trailer and that its value is $5,000. Mother is correct. Further, our review of the record reveals that there was no evidence presented during the hearing regarding a second horse trailer. The trial court abused its discretion in including two horse trailers in the marital pot.

[49] In addition, Mother argues that the trial court abused its discretion when it stated on the marital assets sheet that the Jet Bandsaw and the Grizzly Planer do not exist. Our review of the evidence reveals that Father testified that he has never owned a Jet Bandsaw or a Grizzly Planer and that those items on Mother's list of assets do not exist. The trial court did not abuse its discretion in determining that those assets do not exist.

[50] Lastly, Mother argues that the trial court abused its discretion when it ordered Father to pay her an equalization payment from his Lincoln LG Retirement Account. She contends that there are four Lincoln Retirement Accounts, two belong to Father and two belong to Mother. According to Mother, the trial court's order is not clear from which account the equalization payment is to come. We disagree.

[51] First, if Father is making the payment, it will come from one of his two accounts. Second, Father's marital assets list includes a Lincoln FG Retirement Account and a Lincoln Retirement Account. It appears that the trial court committed a scrivener's error when it ordered the equalization payment to come from Father's Lincoln LG Retirement Account rather than the Lincoln FG Retirement Account. The trial court can correct this error on remand. Further, we find no ambiguity and no abuse of discretion in the trial court awarding Father an asset and then ordering Father to make an equalization payment from that asset.

## 4. Non-Disparagement Clause

[52] Lastly, Mother argues that the non-disparagement clause in the dissolution decree is an unconstitutional prior restraint on speech. We agree.

> The First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. Const., amend. I. "A prior restraint is a term used to describe 'administrative and judicial orders forbidding certain communications when issued in

advance of the time that such communications are about to occur.'" *WPTA-TV v. State*, 86 N.E.3d 442, 447 (Ind. Ct. App. 2017) (quoting *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993)). "Restraining orders and injunctions that forbid future speech activities," such as non-disparagement orders, "are classic examples of prior restraints." *In re Paternity of G.R.G.*, 829 N.E.2d 114, 124 (Ind. Ct. App. 2005) (citation omitted); *see also Shak v. Shak*, 484 Mass. 658, 144 N.E.3d 274, 277 (2020) ("Nondisparagement orders are, by definition, a prior restraint on speech.").

"The common thread running through free speech cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on free speech rights." *WPTA-TV*, 86 N.E.3d at 447 (citing *Neb. Press Ass'n. v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)). Thus, while "a prior restraint is not per se unconstitutional," *id.*, it does come to a court "'bearing a heavy presumption against its constitutional validity.'" *In re Paternity of K.D.*, 929 N.E.2d 863, 868 (Ind. Ct. App. 2010) (quoting *N.Y. Times Co., v. U.S.*, 403 U.S. 713, 824, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). To determine whether a prior restraint is constitutional under the First Amendment, the United States Supreme Court "has looked to (a) 'the nature and extent' of the speech in question, (b) 'whether other measures would be likely to mitigate the effects of unrestrained' speech, and (c) 'how effectively a restraining order would operate to prevent the threatened danger.'" *Shak*, 144 N.E.3d at 279 (quoting *Neb. Press Ass'n*, 427 U.S. at 562, 96 S.Ct. 2791). In addition, "'the [United States Supreme] Court has repeatedly emphasized that the prior censorship of expression can be justified only by the most compelling government[al] interest.'" *David K. v. Lane*, 839 F.2d 1265, 1276 (7th Cir. 1988) (quoting *Brown v. Glines*, 444 U.S. 348, 364, 100 S.Ct. 609, 62 L.Ed.2d 540 (1980) (Brennan, J., dissenting)).

There is a compelling government interest "in protecting children from being exposed to disparagement between their parents."

*Shak*, 144 N.E.3d at 279 (quotation and citation omitted); *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (noting safeguarding the physical and psychological well-being of minors is a compelling state interest); *G.R.G.*, 829 N.E.2d at 125 (holding a non-disparagement order was constitutionally permissible where it furthered the best interests of the child).

*Israel v. Israel*, 189 N.E.3d 170, 179–80 (Ind. Ct. App. 2022), *reh'g denied*, *trans. denied*.

[53]    In the *Israel* case, the father argued that a non-disparagement clause was an unconstitutional prior restraint on speech. That non-disparagement clause provided as follows:

> The parties shall refrain from making disparaging comments about the other in writing or conversation to or in the presence of [Child], friends, family members, doctors, teachers, associated parties, co-workers, employers, the parenting coordinator, media, the press, or anyone. Disparaging remarks include[e], but are not limited to, negative statements, criticisms, critiques, insults[,] or other defamatory comments. The parties shall not say or do anything or allow a third party to say or do anything about the other party in [Child's] presence that may estrange [Child] from the other party or impair his regard for the other party. The parties shall not involve [Child] in matters that are adult matters and that solely involve the parents or the other parent.

*Id*. at 175.

[54]    We concluded that to the extent the non-disparagement clause prohibited each parent from disparaging the other in their child's presence, the order furthered

the compelling State interest in protecting the best interests of that child and did not violate the First Amendment. *Id*. at 180. We noted that the father did not contend otherwise. *Id*. However, we agreed with the father that the non-disparagement clause went "far beyond furthering that compelling interest to the extent it prohibit[ed] the parents from 'making disparaging comments' about the other in the presence of 'anyone' even when [the child was] *not* present." *Id*. Thus, we concluded that the portion of the non-disparagement clause, which provided that it included "friends, family members, doctors, teachers, associated parties, co-workers, employers, the parenting coordinator, media, the press, or anyone[,]" was an unconstitutional prior restraint on speech that had to be stricken. *Id*. Accordingly, we remanded the case to the trial court to modify the non-disparagement clause in conformity with our opinion. *Id*.

[55] Here, the non-disparagement clause does not prohibit each parent from disparaging the other in the presence of either of their children. Rather, the non-disparagement clause prohibits each parent from disparaging the other to medical professionals, school personnel, coaches, etc. We conclude, as we did in *Israel*, that this clause is an unconstitutional prior restraint on speech that must be stricken. We, therefore, remand this case to the trial court with instructions to strike the non-disparagement clause from the dissolution order. *See id*.

[56] Affirmed in part, reversed in part, and remanded with instructions.

Weissmann, J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

Debra Lynch Dubovich
Levy & Dubovich
Merrillville, Indiana